**The CITY OF DALLAS,
Texas, Appellant,**

**v.**

**Suzanne COX, Individually and as Next Friend of Carrie Cox and Courtney Cox, Minors, as well as Suzanne Cox, Executrix of the Estate of Ronnie Cox, Deceased; R.D. Cox; and the Town of Addison, Appellees.**

**No. 05–89–00216–CV.**

Court of Appeals of Texas, Dallas.

June 13, 1990.

Rehearing Denied Aug. 20, 1990.

---

Jim Cowles, John M. Weaver, Sam A. Lindsay, R. Brent Cooper, Dallas, for appellant.

Edwin E. Wright, III, R. Jack Ayres, Diane F. Walker, Thomas V. Murto, III, Julie Kay Baker, Dallas, for appellees.

Before WHITHAM, ROWE and BAKER, JJ.

## OPINION

ROWE, Justice.

The City of Dallas appeals from the trial court's judgment in a suit in which Suzanne Cox, individually and as next friend of Carrie and Courtney Cox, was a plaintiff, R.D. Cox and the Town of Addison were plaintiff-intervenors (hereinafter collectively referred to as the Coxes), and Dallas was a defendant. The lawsuit involved the shooting death of Addison Police Officer Ron Cox by Dallas Police Officer Darren Coleman during a drug raid conducted in Dallas by officers of both police departments. In thirteen points of error, Dallas complains of the trial court's imposition of discovery sanctions and other alleged errors. We affirm the trial court's judgment.

The Coxes filed numerous motions for sanctions for alleged discovery abuses on Dallas's part. The trial court granted the first motion and ordered Dallas to pay $93,250 to the Coxes. The trial court later granted the second through ninth motions for sanctions and struck Dallas's answer. The trial court then rendered a judgment against Dallas on the issue of liability and conducted a jury trial on damages. After the jury made its findings, the trial court rendered a judgment awarding the Coxes $2,350,723.92 plus postjudgment interest. The trial court awarded Addison $52,133.16 plus postjudgment interest.

We deal with Dallas's second point of error first, where it contends that the trial court abused its discretion in granting the first motion for sanctions and ordering Dallas to pay $93,250 as a discovery sanction. The trial court had issued an order specifying deadlines of November 2 and November 5, 1987, for producing documents and answering interrogatories. On November 13, 1987, the Coxes moved for sanctions, alleging a pattern of obstructive and dilatory discovery tactics by Dallas. Specifically, the motion alleged, among other things, that requested documents were not fur-

nished and that other documents were furnished only during depositions in a piecemeal fashion. Dallas responded and acknowledged that some documents were not provided as requested and ordered. Dallas maintained that these failures were due to oversights, mistakes, and inadvertence, and that such failures were to be expected because the materials requested were voluminous.

The Texas Rules of Civil Procedure authorize courts to require parties to pay reasonable expenses, including attorney fees, for failure to comply with proper discovery requests or court orders on discovery, or for abuse of the discovery process. Tex.R.Civ.P. 215(2)(b)(8), 215(3). Discovery sanctions imposed by a trial court will be set aside only if the court clearly abused its discretion. *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986) (per curiam). The test for abuse of discretion is not whether the reviewing court thinks that the facts presented an appropriate case for the trial court's action. Rather, the question on appeal is whether the trial court acted without reference to any guiding rules and principles. The mere fact that a trial judge decided a matter within his discretionary authority in a different way from the manner in which an appellate judge might have decided the matter under the same circumstances does not establish that an abuse of discretion has occurred. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Discovery sanctions may properly be imposed to secure compliance with discovery rules, to deter other litigants from violating discovery rules, and to punish parties for violation of the rules. *Bodnow*, 721 S.W.2d at 840. Rule 215 contemplates adherence to, and enforcement of, court orders concerning discovery. Tex.R.Civ.P. 215(1), 215(2). Discovery sanctions that do not serve the purposes that sanctions were intended to further constitute an abuse of discretion. *Bodnow*, 721 S.W.2d at 840.

Before we review the propriety of the granting of the motions for sanctions, we will first discuss the nature of the lawsuit. The Coxes alleged several causes of action against Dallas. One cause of action was based on federal civil rights law. *See* 42 U.S.C.A. § 1983 (West 1981). A cause of action under section 1983 is stated when a plaintiff alleges that personal injury or death was caused by the use of excessive force by police officers, thereby effecting an unreasonable seizure of a person under the Fourth Amendment. *See Graham v. Connor*, — U.S. —, 109 S.Ct. 1865, 1867, 1871, 104 L.Ed.2d 443 (1989); *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 1380, 1382, 103 L.Ed.2d 628 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Under section 1983, a municipality may be held liable when execution of its policies or customs inflicts injury that amounts to a constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). A municipality's failure to train its employees in a relevant respect reflecting a deliberate indifference to the rights of its inhabitants may properly be considered a custom or policy that is actionable under section 1983. *City of Canton*, 109 S.Ct. at 1205 & n. 10.

The Coxes alleged that Ron Cox's death was caused by the use of excessive force inflicted in accordance with policies or customs of the Dallas Police Department. They alleged that the execution of, and compliance with, Dallas Police Department policies, including training policies, caused Ron Cox's death, depriving him of his constitutional right to be free from unreasonable seizure. They alleged that the policies were such that officials of Dallas knew or should have known that Dallas police officers were likely to kill without proper justification and restraint. The Coxes further alleged that the Dallas Police Department armed its officers with machine guns on fully automatic mode in reckless disregard of, or deliberate indifference to, the fact that use of such weapons would cause con-

stitutional deprivations.[1] The Coxes contended that the alleged acts and omissions constituted violations of section 1983. They also contended that the alleged conduct was actionable under the Texas Tort Claims Act[2] and Texas common law. These allegations should be considered in reviewing the trial court's discovery sanctions.

■ With the foregoing in mind, we consider the record with respect to the first motion for sanctions. The Plaintiffs' First Request for Production, filed June 1, 1987, asked for all written documents setting out the deadly force policy of the Dallas Police Department between 1982 and 1987, including all manuals, memos, and bulletins. All written documents evidencing formulation of the deadly force policy in effect at the time of the drug raid were also requested. The Coxes' counsel produced, at the sanctions hearing, a Dallas Police Chief memorandum with attached Special Orders on the department's deadly force policy.[3] Dallas had failed to produce these documents in response to the discovery requests. These documents were admitted as evidence at the hearing.

The trial court's production deadline order required responses to the Plaintiffs' Third and Fourth Requests for Production. The third request asked Dallas for all written documents stating, describing, or setting forth rules, orders, policies, procedures, or standard operating procedures for the Tactical Section or Unit or the Special Operations Division of the Dallas Police Department.[4] The fourth request asked for all memos, bulletins, letters, communications, or other written documents that pertained to the Tactical Section for the years 1985, 1986, and 1987.

At the hearing, it was shown that a Tactical Officers' Manual was produced during the deposition of Officer Darren Coleman, a member of the Tactical Section, a participant in the drug raid, and the officer who shot Cox. Coleman testified in his deposition that it was the manual in force when the raid occurred. Lieutenant Scoggins, who was responsible for seeing that the requested Tactical Section documents were provided, testified at the hearing that the manual produced at Coleman's deposition was not the manual that was in force at the time of the drug raid and that it was erroneously produced. He stated that a subsequently provided manual was the controlling manual at the time of the raid.[5] The Coxes' counsel produced at the hearing yet another version of a Tactical Officers' Manual that had not been furnished by Dallas, and this manual was admitted into evidence. Scoggins was asked if there were any other materials or manuals concerning the Tactical Section that he had not produced, and he replied that the only thing he could not find was an old SOP (Standard Operating Procedures). An Internal Affairs Division file with an excerpt from another (fourth) version of a Tactical Section manual was admitted into evidence, and Scoggins admitted that he had not produced that manual.[6] It was

1. The petition filed by the Coxes and Addison included other detailed allegations concerning selection of officers; training; administration; psychological support, testing, and training of officers; investigation of shootings by officers; and execution of, and compliance with, police department rules, policies, and procedures.

2. *See* Tex.Civ.Prac. & Rem.Code Ann. §§ 101.-001–.109 (Vernon 1986 & Supp.1990).

3. The memo indicated that the Dallas Police Department's deadly force policy was intended to protect both police officers and citizens.

4. The drug raid in which Officer Cox was shot was conducted by officers of the Addison Police Department Narcotics Section and the Dallas Police Department Tactical Section. The Tactical Section of the Dallas Police Department was

also referred to as the Special Operations Division.

5. On the day before the hearing, Edward Herbst, a Tactical Section officer who participated in the drug raid, had been deposed. He testified that the manual identified by Coleman as being in force and effect at the time of the drug raid was not the controlling manual at the time of the raid. Scoggins was also deposed on the day before the hearing, and he gave testimony to the same effect.

6. All of the manuals would certainly come within the scope of matters requested in the Plaintiffs' Third Request for Production, which was not limited to materials in force and effect at any particular time. These discovery requests were not open-ended, however, because the Dal-

established at the hearing that none of the manuals were dated in a manner that would allow determination of their effective dates.

The Coxes' counsel argued at the hearing that a number of witnesses would have to be redeposed because Dallas was now maintaining that the previously produced Tactical Section manual was not controlling at the time of the drug raid. In our view, that argument is reasonable, considering the circumstances. Obviously, time, effort, and money were wasted in depositions that had already been taken regarding a manual that Dallas initially produced as controlling but later repudiated. Those depositions were taken without the benefit of the memorandum and Special Orders that Dallas failed to produce. The Coxes' counsel also argued that considerable time and expense were involved in hiring and consulting with experts. Those consultations were based on information previously provided by Dallas. As demonstrated at the hearing, the information provided was incomplete, and some of it was later repudiated by Dallas. Certainly, additional consultation with the experts would be necessary regarding the new information and materials not previously furnished by Dallas. Expert evaluations and opinions based on erroneously provided and incomplete information would be subject to reevaluation. The Coxes' counsel also argued that Dallas's established failures to comply with discovery requests and court orders did not inspire confidence regarding current and future compliance.

The record contains a tabulation of expenses incurred by the Coxes. Those expenses included attorneys' time spent meeting with expert witnesses and taking depositions and preparing for and attending court hearings, other deposition expenses, and other expert witness expenses. The trial court award of $93,250 for expenses was considerably less than the tabulated total of expenses.

The record contains ample justification for the trial court's action; it does not indicate that the trial court acted arbitrarily, capriciously, or unreasonably. *See Downer*, 701 S.W.2d at 242–43. Based on the record before us, we cannot say that the trial court acted without reference to any guiding rules and principles. *See id.* at 241–42; *see also Brantley v. Etter*, 677 S.W.2d 503, 504 (Tex.1984) (per curiam) (amount of attorney fees awarded as discovery sanction is solely within sound discretion of trial judge, to be set aside only upon showing of clear abuse of discretion). The record shows that Dallas failed to comply with discovery requests and related court orders and that the Coxes incurred expenses because of those failures. There was additional evidence of Dallas's failure to comply with discovery requests and orders, but we consider the matters detailed above to be more than sufficient to support the trial court's action. The sanction imposed was authorized by the applicable rule. *See* TEX.R.CIV.P. 215(2)(b)(8), 215(3). Moreover, we think that the sanction imposed was in accordance with the purposes of discovery sanctions. *See Bodnow*, 721 S.W.2d at 840. We overrule Dallas's second point of error.

In its first point of error, Dallas argues that the trial court abused its discretion in granting the second through ninth motions for sanctions and striking Dallas's answer. The Texas Rules of Civil Procedure authorize the striking of pleadings for failure to comply with proper discovery requests or court orders providing or permitting discovery, or for abuse of the discovery process. TEX.R.CIV.P. 215(2)(b)(5), 215(3). In reviewing the trial court's action, we are bound by the principles previously discussed regarding the trial court's discretion as to discovery sanctions. In addition, with respect to determining a trial judge's guiding rules and principles governing the imposition of sanctions, we should look to pertinent federal

---

las *Police Department's* Tactical Section had been in existence for a limited number of years.

It should also be noted that the fourth excerpted version of a Tactical Manual was pro-

duced by Dallas as part of a response to a discovery request that was unrelated to the request for materials concerning the Tactical Section.

court decisions. *Downer*, 701 S.W.2d at 242; *Tate v. Commodore County Mut. Ins. Co.*, 767 S.W.2d 219, 222 (Tex.App.—Dallas 1989, writ denied). The United States Supreme Court has suggested that the sanction of striking a party's pleadings might violate due process guarantees if the party were unable, despite good faith efforts, to comply with discovery requests or orders. *See Societe Internationale Pour Participations Industrielles v. Rogers*, 357 U.S. 197, 210, 78 S.Ct. 1087, 1094–95, 2 L.Ed.2d 1255 (1958). Nevertheless, this severe sanction must be available in appropriate cases to penalize and deter failures to comply with discovery orders. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). If a trial court properly finds, or could properly have found, that a failure to comply with discovery requests or orders was willful, in bad faith, or due to some fault of the disobedient party, the sanction of striking a party's pleadings will generally be upheld. *See Worldwide Anesthesia Assocs., Inc. v. Bryan Anesthesia, Inc.*, 765 S.W.2d 445, 448 (Tex.App.—Houston [14th Dist.] 1988, no writ); *Woodruff v. Cook*, 721 S.W.2d 865, 868–69 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Southern Pac. Transp. Co. v. Evans*, 590 S.W.2d 515, 518 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.), *cert. denied*, 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980). In determining the propriety of sanctions, the trial court is entitled to consider the entire record of the case. *Woodruff*, 721 S.W.2d at 868; *see Downer*, 701 S.W.2d at 241.

Before we discuss the hearing on the second motion for sanctions, we note some pertinent facts and circumstances as shown by the record. In its order granting the first motion for sanctions, the trial court found that Dallas had been dilatory and obstructive in obeying discovery orders of the court and had continuously acted in bad faith during the discovery process. The trial court also stated that "any further abuses of the discovery process by the Defendants herein or anyone in privity with [them,] including but not limited to the abuses demonstrated to date, may subject the Defendants to additional sanctions, including the striking of their pleadings at that time."

At the hearing on the first motion for sanctions, counsel for the Coxes had noted that Dallas had failed to produce the psychological records of Coleman, the officer who shot Cox, which had been ordered by the court. Dallas had informed the Coxes that those records had been destroyed. Dallas's counsel confirmed that those records were kept for two years and then destroyed. The Coxes' counsel then referred to a state administrative regulation mandating maintenance of psychological records. *See* Tex.State Bd. of Examiners of Psychologists, 22 Tex.Admin.Code § 465.22 (West Jan. 3, 1989) (Record Maintenance). According to its terms, the regulation is applicable to psychologists, and the record of the hearing shows that the Dallas Police Department employed a police psychologist.

When the trial court's order granting the first motion for sanctions was issued on December 4, 1987, Dallas had recently found and delivered some of the psychological records of Darren Coleman that were allegedly destroyed, but the trial court's order recited that it "does not adjudicate any question of sanctions relating to the production or the failure to produce [Coleman's] psychological records by the Defendants or any related matter. The Court expressly reserves any ruling on such questions for a later time." The trial court further ordered Dallas to deliver those records to a specified questioned documents examiner.

In a separate order dated December 10, 1987, the trial court again ordered Dallas to produce certain documents, including all written documents setting forth the deadly force policy at the time of the drug raid and all written documents controlling or governing the actions, conduct, or behavior of Tactical Section officers who were involved in the drug raid and the Cox shooting. In an apparent attempt to be very specific, the trial court's order stated, "This directive includes all documents which governed the actions, conduct and behavior of

these officers, be it related to communications, dress, training, weapons selection, ammunition selection, planning of the raid, execution of the raid, use of deadly force, tactical or policy matters, or other habits, customs or practices." The trial court ordered production of all written documents outlining, describing, or defining the authority by which the Tactical Section planned, conducted, or executed drug raids in 1986. The trial court required the Chief of Police or an officer with the Dallas Police Department with the rank of captain or higher to state clearly in writing and under oath that the ordered documents have been produced. The order required Dallas to identify any written documents formerly possessed that had been destroyed, mutilated, altered, or lost regarding four specified areas (Coleman's psychological records; written documents concerning the existence, operation, performance, or training of the Tactical Unit from January 1, 1984, to date, including all SOPs, manuals, directives, orders, and memos; all written documents pertaining to the formulation, operation, correction, or changes in the deadly force policy from January 1, 1984, to date; all written documents concerning the planning, conduct, or execution of hazardous drug warrants or drug raid operations). The trial court ordered production of all written documents authorizing or directing the destruction, mutilation, alteration, or loss of those documents. The trial court ordered the Chief of Police or an officer ranked captain or higher to clearly set forth in writing and under oath: (1) all documents which had been destroyed, mutilated, altered, or lost; (2) whether such destruction, mutilation, alteration, or loss was authorized and, if so, whether the authorization was written or oral; (3) the authorizing documents, if written; and (4) the identity of the authorizing person or persons and the date of the authorization, if authorization was oral. The order required the Chief of Police or an officer ranked captain or higher to clearly state in writing and under oath certain information about the rules, manuals, memos, orders, SOPs, and other written documents ordered to be pro-

duced: (1) the specific date when matters or directions contained in the written documents became effective; (2) the identity of the person who authorized that the writings should become effective; (3) when and to whom the written documents were distributed; and (4) the manner in which the written documents were distributed.

The Coxes' second motion for sanctions was primarily addressed to Dallas's initial contention that Coleman's psychological records no longer existed because they were destroyed in accordance with policy and Dallas's subsequent determination that some of those records did in fact exist because they had not been destroyed. The Coxes alleged that Dallas had materially misstated the policy regarding destruction of the psychological records of police officers, that Dallas had materially misrepresented the nature and extent of any search or effort to locate Coleman's psychological records, and that the records ultimately produced did not appear to be complete, genuine, and authentic. The motion stated that this alleged conduct constituted an actual or constructive fraud on the court because Dallas's agents and employees either knew or should have known that the statements concerning Coleman's psychological records were false. The motion requested, among other things, the striking of Dallas's pleadings. Our record does not contain a written response to this motion.

An extensive hearing was conducted on the second motion for sanctions. One of the witnesses at the hearing was Edwin Spencer, Administrative Assistant to the First Assistant Chief of Police. Spencer was in charge of the Public Information Office of the Dallas Police Department. He testified that he had talked to the police department psychologist, Dr. Somodevilla, about Coleman's psychological records. Spencer's understanding, based on this conversation with Dr. Somodevilla, was that the records had not been maintained. Spencer stated that he then talked to Captain John Chappelle of the police department's Personnel Division in an effort to confirm the information provided by Dr. Somodevilla. Chappelle told him that it

was the department's policy to purge psychological records after an employee had been with the department for two years because such records were dated and had no useful value.

During Spencer's testimony, a Dallas Administrative Directive was admitted into evidence. The directive concerned records disposition, and Spencer acknowledged that it was binding on all city departments, including the police department. The directive defined permanent records as any records that have been determined by department heads to have sufficient value to warrant their continued preservation. The directive defined a records control schedule as a records disposition schedule which designates records, specifies the retention period for such records, and determines the means of final disposition such as destruction or micrographic processing. Under the heading "PROCEDURES," the directive stated, "To apply records control schedules, they must have the signed approval of the department head. This approval constitutes the authority to destroy records at the expiry of the retention period." Spencer agreed that the directive stated that records could not be destroyed in the absence of the authority provided by a records control schedule signed by a department head. The directive had an effective date of April 1, 1978.

A memorandum sworn to by Captain John Chappelle of the Dallas Police Department was introduced into evidence. It was sworn to in compliance with the trial court's previous order of December 10, 1987, and was part of the information furnished by Dallas in accordance with that order. The memo stated that the "memorandum on the psychological evaluation of Coleman was discarded as part of a longstanding practice of destruction of the background investigation, polygraph results, preliminary interview, and psychological evaluation." The memo also stated:

The Personnel Division does not have any written documents which authorizes [sic] the destruction of records. Sometime before 1978, an oral directive was given to destroy the background investigations, polygraph results, preliminary

interviews, and psychological evaluations of all individuals who were hired. The records were to be maintained in a sealed envelope for two years, then destroyed. It is unknown as to when and who issued the oral order.

Spencer testified that the Dallas Administrative Directive discussed above apparently governed police department records. He stated that his understanding of the directive was that records could not be destroyed without the authority provided by a records control schedule signed by a department head. However, Spencer declined to draw any conclusions as to whether the destruction of documents in accordance with an oral policy or order was in violation of the Dallas Administrative Directive. He stated that no one that he talked to within the police department regarding Coleman's records had mentioned the directive.

Captain John Chappelle was called as a witness at the hearing. He testified that some of Coleman's psychological records should have been destroyed but were not destroyed because they were erroneously commingled with records that were to be maintained. He stated that the directive was not followed when Coleman's psychological records were destroyed. He stated that the directive did not have to be followed because it did not deal with records such as the psychological records. Chappelle said that he understood that the directive only dealt with permanent records. However, he also acknowledged that the directive dealt with records that could be destroyed or eliminated. Nevertheless, he refused to characterize records that could be destroyed or eliminated as anything other than permanent records.

Dr. Walter Stenning was called to testify as an expert witness. He has both a bachelor's degree and a Ph.D. degree in psychology. He stated that he held three titles at Texas A & M University: Professor in the Department of Educational Psychology, Professor in the Department of Educational Curriculum Instruction, and Chief Psychologist for Law Enforcement Security Training. He had helped to train law

enforcement agencies and personnel at the local, state, national, and international levels. He had trained people in the U.S. Marshals Service and the U.S. Secret Service. His training activities involved the areas of hostage negotiations, stress on peace officers, selection of peace officers, and the use of firearms and deadly force by peace officers. He estimated that he had interviewed at least 400 applicants for various law enforcement agencies.

Dr. Stenning examined a grid sheet or scoring sheet furnished by Dallas and represented by Dallas to be Coleman's grid sheet that was filled in by Coleman as part of the process of taking a psychological test. The grid sheet contained responses to questions in a personality test known as the Minnesota Multiphasic Personality Inventory (MMPI). There were spaces on the grid sheet for the name, sex, and age of the person taking the test. Dr. Stenning testified that the name insures that the grid sheet can be matched with the person who actually gave the responses on the sheet. He stated that the sex of the person taking the test was essential to correct scoring of the test because some different responses can be expected based on the sex of the test-taker. He said that the age of the person taking the test can be important because different responses and behaviors may or may not be appropriate depending on the person's age. He indicated that all of the information (name, age, and sex) also helps to insure the integrity of the test by providing information that can be double-checked so that one person's grid sheet does not get erroneously matched with another person who also took the test.

Dr. Stenning noted that one of Coleman's grid sheets provided by Dallas did not contain the name, age, or sex of the test-taker. He characterized the absence of the name and the sex as surprising. He said that the absence of the age was strange, but less strange than the absence of the name and gender. He characterized the absence of all three items as very surprising. During his career, he remembered only one instance of all three items being missing from an MMPI grid sheet. He said that one of his assistants had failed to obtain the information, and he reprimanded the assistant for that failure. Dr. Stenning stated that the grid sheet could not be properly scored without the gender information.

Dr. Stenning also testified that it was his opinion that written notes of in-depth psychological interviews of police applicants should be made and preserved in order to allow the psychologist to refresh his memory at a later time. More specifically, he stated that an in-depth interview of Coleman should have been conducted, and written notes of that interview should have been made and maintained. The Coleman psychological records furnished by Dallas did not contain any such notes. When asked if such notes would be essential records required to be maintained by the State Board of Examiners of Psychologists, Dr. Stenning replied that he would see that as a legitimate aspect of the state board's requirements on record-keeping.[7] He explained that an initial set of data concerning an individual becomes a base line norm. Data or information concerning that individual obtained at a later time can then be compared to this base line norm. Therefore, according to Dr. Stenning, MMPI scores, other test data, and written notes of an in-depth interview should be maintained during a law officer's career so that information obtained in subsequent counseling sessions can be meaningfully compared with that officer's base line norm information.

Dr. Stenning then examined a second MMPI scoring sheet that was represented by Dallas to be Coleman's scoring sheet. This scoring sheet also did not contain age or sex information, but it contained a signature reading "Darren Coleman." Dr. Stenning also examined Coleman's signature as found on Coleman's deposition. He was asked to compare the two signatures, and he stated that they did not appear to be the

---

7. The state regulation referred to earlier provides in part that "[a]ccurate, current, and pertinent records of essential psychological services must be maintained." Tex. State Bd. of Examiners of Psychologists, 22 Tex.Admin.Code § 465.22 (West Jan. 3, 1989) (Record Maintenance).

signature of the same person. When requested to assume that the deposition signature was in fact Officer Coleman's signature, and when asked about the scoring sheet signature, Dr. Stenning replied that the signature on the scoring sheet did not appear to be Coleman's signature.

In preparation for the hearing, Dr. Stenning had viewed Coleman's video deposition. In that deposition, Coleman testified about an incident in August of 1985 when Coleman shot and injured a man while Coleman was on duty. Coleman testified that he went to Dr. Somodevilla, the Dallas police psychologist, to discuss the shooting. Among the materials furnished by Dallas, Dr. Stenning found no written record of that consultation. He expressed his opinion that a written record or written notes of the consultation should have been made and maintained. He stated that written notes should be preserved because the psychologist has no idea at the time of the initial consultation whether additional counseling or sessions will be necessary, or whether any problems associated with the shooting will be immediately resolved or will be of an ongoing nature. He said that a psychologist needs a chronological record. He characterized maintenance of such a record as extremely important. He stated his opinion that the failure to keep such records would be a violation of the state regulation discussed previously.

Coleman had also testified in his deposition that he went to see Dr. Somodevilla on three or four occasions following the Ron Cox shooting. Dr. Stenning testified that he found no written record of these consultations among the materials provided by Dallas. He stated that written records of those consultations definitely should have been made and preserved, and he again opined that the failure to do so would be in violation of the state regulation mandating maintenance of psychological records. He described the failure to make written notes of such consultations as a departure from good psychological practice. He said that he would have a hard time believing that a competent psychologist would not have made any written notes of the Coleman interviews that followed the two shootings by Coleman.

Dr. Stenning testified that the idea that psychological data can become dated or out-of-date is a misconception. He said that personality characteristics, which psychological tests attempt to identify, become relatively firm and stable at about the age of sixteen to eighteen years, unless something unusual, such as a psychological problem or extreme trauma, happens to a person. He also stated that maintenance of earlier data allows a determination as to whether there has been such an unusual psychological occurrence by means of comparing recent test results with older test results. He noted that there would be a high probability that two-year-old data would be reliable and valid. Dr. Stenning stated his opinion that there could be no dispute that psychological evaluations of police officers, test scores, and written notes of in-depth interviews and consultations, including consultations about shootings, would be essential psychological records that must be maintained.

Dr. Santiago Somodevilla, the Dallas Police Department psychologist, also testified. As to the belated discovery of some of Coleman's psychological records, he explained that after he read newspaper accounts suggesting the possibility of a coverup by the police department, he personally made an attempt to locate any existing records. He called Vicki Jackson, a clerk in the Personnel Division, and inquired as to whether Personnel had any of Coleman's psychological records. He stated that Jackson put him on hold and then came back and told him that she had found the records.

Dr. Somodevilla agreed that, considering the size of his potential pool of clients, it was necessary to keep accurate records so that the records of different individuals do not get confused. He stated that the failure of a police applicant to write his name on the MMPI grid sheet is probably not a good testing procedure. He said that Coleman should have written his name on the MMPI grid sheet. He also agreed that the sex and age of the applicant are important

components of the MMPI. Dr. Somodevilla was asked to examine the "Darren Coleman" signature on the other MMPI scoring sheet and the signature on Coleman's deposition. Based on that examination, he said that the signatures obviously were not the same.

About the test-taking procedure, Dr. Somodevilla stated that police applicants would arrive at the Personnel Division and would be given a packet containing various tests. The applicants would take the tests and would keep all of their papers and materials together and turn them into the scorer. He said that after the tests were scored, they were placed in a sealed envelope, and the applicant would deliver the envelope to Psychological Services and hand them to Dr. Somodevilla's secretary. His secretary would then deliver the envelopes to Dr. Somodevilla, and he would examine the test results and then interview the applicant.

Dr. Somodevilla testified that he approved of the policy of destroying the psychological records of hired police applicants after two years. He said that his approval was oral, not written. He acknowledged that a person's basic personality or psychological makeup is in place at age sixteen to eighteen. He agreed that the MMPI probes certain aspects of personality. He said that the results of an MMPI test can be valid in the future, but only for purposes of research.

As to his discussions with police officers and the need to make records of those discussions, he testified that he drew a distinction between interviews and counseling sessions. He characterized an interview as information-gathering, whereas counseling involved a person seeking assistance for a real or imagined problem. He testified that he did not make notes of interviews. He said that an interview with a police officer who has been involved in a shooting is not an insignificant matter. He stated that officers who have been involved in shootings can become incapacitated or become threats to themselves. He agreed that it is vitally important to identify officers who respond inappropriately to a shooting and become psychologically unfit as police officers.

Dr. Somodevilla testified that his discussion with Coleman after Coleman shot a man in 1985 (as discussed above) was an interview. He said that Coleman had some concerns but had no problems requiring treatment or therapy. He stated that he did not make written notes of the interview. Dr. Somodevilla testified that he met with Coleman on three occasions after Coleman shot Ron Cox. He said that all of those discussions were interviews and that he did not make written notes of those interviews. He said that Coleman broke down and started crying during the first interview and that he was emotionally hurting and in pain. As to the second interview, he stated that he did not believe that Coleman was depressed. He stated that he did not make notes of his interviews with Coleman because he did not consider Coleman to be a patient.

Dr. Somodevilla stated that his testimony about all of his interviews with Coleman concerning the 1985 shooting and the Cox shooting were based on personal recollection. He testified that he could not remember his interviews of other police officers that took place before and after these interviews with Coleman. He could not remember any other interviews conducted in the same months as the Coleman interviews.

Dr. Harry Parker testified at the hearing as an expert witness. He said that he was a professor in three departments at the University of Texas Southwestern Medical Center: Physical Medicine and Rehabilitation, Psychiatry, and Rehabilitation Science. He stated that he was also a psychologist licensed by the State of Texas. He had served as Associate Dean and Dean of the School of Allied Health Sciences at the University of Texas Health Science Center. Dr. Parker examined the Coleman psychological records provided by Dallas. When asked if he had any concerns about those documents, he said that he was concerned about the fact that there was no narrative report or any comments explaining the significances of the raw data. He said that the lack of age and sex informa-

tion and the lack of the test-taker's name on one sheet were matters of concern to him. He noted that a document called "California Psychological Inventory" had an unidentifiable name and no age or sex information or other salient information. He stated that the records were incomplete and that important information was missing.

Dr. Parker explained that the MMPI is a standardized test, and the manner in which it is administered is important to determining the accuracy of the test. He said that the MMPI documents, as furnished by Dallas, did not provide assurance that the test was given under appropriate standardized conditions. When asked if he agreed that psychological test data becomes invalid or archaic after a period of time, Dr. Parker replied that he did not agree that psychological records should be destroyed. He said that initial test data represent a point of departure or a set of base line data that allows determination as to whether a client or patient has been affected by intervening events or circumstances. Dr. Parker explained that psychologists look at all available information and make comparisons of information obtained at different times. He stated that he knew of no school of thought within the field of psychology which would encourage the destruction of psychological records. He expressed the view that any errors should be made on the side of collecting records rather than disposing of them.

Dr. Parker testified that the keeping of good interview and evaluation notes is a basic principle taught to students of psychology because psychologists simply cannot recall all of the pertinent information about cases and clients. Dr. Parker found it incomprehensible that a psychologist would not have made any written records of an interview of a police officer after the officer was involved in a shooting. When asked about Coleman's shooting of Cox followed by the psychologist seeing Coleman on three occasions after the shooting, Dr. Parker stated that failure to make any

written record of the three interviews would not be in accordance with accepted standards of psychological practice. He said that such failure to make written records defies understanding, and he characterized it as unthinkable. He stated that excusing the failure to make written records by stating that there was no need for treatment would not be a sufficient explanation for not making notes. He testified that he believed that notes would in fact have been made. Dr. Parker said that any psychologist under his supervision who failed to make notes under the described circumstances would have been removed from that activity.

Vicki Jackson, the clerk who found Coleman's psychological records when Dr. Somodevilla inquired about them by telephone, testified at the hearing. She said that she found them in a matter of minutes while Dr. Somodevilla remained on the phone waiting. She stated that she had no difficulty finding the records. She testified that she had not previously been requested to look for Coleman's psychological records. She had no knowledge of any such request directed to anyone in her department (the applicant section of the Personnel Division). She said that she was normally the person to contact about such records and that the records were readily available and could be easily found. She stated that, as far as she knew, it was common knowledge within the police department that she was the person to be contacted in order to obtain psychological records of police applicants. She was not aware of any memos or staff meetings or other forms of information or inquiries concerning the court-ordered psychological records.

On December 10, 1987, the Coxes filed three additional motions for sanctions. The first of these, the third motion for sanctions, dealt with Dallas's alleged failure to produce requested and ordered SOP (Standard Operating Procedures) manuals and Tactical Section manuals.[8] The fourth motion for sanctions addressed Dallas's al-

---

8. As noted previously, evidence was presented at the hearing on the first motion for sanctions

concerning discovery problems related to such manuals.

leged refusal to answer certain interrogatories on the ground that the information inquired about was too cumbersome, oppressive, or not subject to being readily provided. The motion also objected to Dallas's refusal to stipulate that the Dallas Police Department systematically and habitually ignored its own high risk apprehension policy.[9] The fifth motion for sanctions and motion for contempt did not deal with discovery problems. Instead, it dealt with Dallas's alleged failure to abide by the trial court's "gag order" forbidding public discussion of the case. On December 30, 1987, the Coxes filed their sixth motion for sanctions. This motion complained that Officer Jerome Thomas's recantation of prior deposition testimony amounted to discovery abuse.[10] Because the fifth motion for sanctions did not deal with discovery problems, and because no hearing was held on the allegations contained in the third, fourth, and sixth motions for sanctions, we postpone further discussion of those motions.

On January 15, 1988, the Coxes filed their seventh motion for sanctions. Among other things, the motion alleged that Dallas was guilty of additional failures to properly comply with discovery orders and requests for the SOP (Standard Operating Procedures) manuals and Tactical Section manuals. As noted previously, Dallas was ordered to furnish the SOPs and Tactical Section manuals (and any other documents) that controlled or governed the actions, conduct, or behavior of the Tactical Section officers who were involved in the drug raid and the Cox shooting (as well as other SOPs and Tactical manuals). These documents had been requested in at least two separate requests for production.

At the hearing on the first motion for sanctions, Lieutenant Scoggins, who was

responsible for seeing that the requested documents concerning the Tactical Section were provided, was asked about the existence of a book of regulations called Standard Operating Procedures of the Special Operations Division [11] of the Dallas Police Department. Scoggins acknowledged that these books were revised every year and that a version had existed for each of the years 1984, 1985, 1986, and 1987. He testified that only the 1987 version had been produced because he was unable to find any of the other versions, including the 1986 version, which was in effect at the time of the Cox shooting. He further stated that, as far as he knew, the earlier versions had been destroyed. Scoggins had made statements to the same effect in his deposition. He also stated in his deposition that, as far as he knew, the 1986 and 1987 versions of the SOPs were basically the same.

On January 4, 1988, Dallas produced a different version of the SOP manual. Deputy Chief of Police R.L. Schifelbein of the Special Operations Division swore that this particular SOP manual was the correct manual that should have been furnished. Along with this newly provided manual, Dallas produced a memorandum from Schifelbein to counsel for Dallas. The memo was dated December 3, 1987, and it explained that the SOP previously provided by Scoggins was an unapproved master copy of a version that was in the process of being updated. The memo stated that the correct version of the SOP manual, which was dated 1983, along with the incorporated changes, was the manual under which the Tactical Section had been operating since 1983, coupled with a series of memoranda.[12] These memoranda were said to

---

**9.** This allegation was based on deposition testimony of Officer Jerome Thomas, a Tactical officer and participant in the drug raid resulting in Cox's death. Thomas had testified, based on his experience, that certain provisions of the high risk apprehension policy were invariably not followed. The motion also alleged that other discovery responses confirmed the testimony of Thomas.

**10.** By an affidavit, Thomas repudiated his previous deposition testimony about his description

of a manual that he had turned in after he transferred out of the Tactical Section.

**11.** As previously noted, the Tactical Section of the Dallas Police Department was also referred to as the Special Operations Division.

**12.** This explanation seems to be inconsistent with Scoggins's prior testimony that different SOP manuals had existed for each of several previous years.

stipulate operational changes which were not included in the 1983 manual, but which would be incorporated in the updated version that was being completed. On January 5, 1988, Dallas provided the various memoranda and attachments which were apparently necessary to complete the correct version of the SOP manual as described in Schifelbein's memo.

The cover letter accompanying the January 5 production and the December 3 Schifelbein memo did not provide definite information as to whether the most recently furnished SOP material represented the SOPs which were in effect at the time of the drug raid. The memo and cover letter indicated that the newly produced material represented the SOPs which were in effect as of the time of their production, not as of the time of the drug raid. In this regard, the cover letter from counsel for Dallas, dated January 5, 1988, states: "I am reproducing the Standard Operating Procedures to ensure that you are aware of the one which is currently in effect." Because we do not find the attachments and memoranda accompanying the newly furnished SOP manual in our record, we cannot ascertain whether those documents would allow a determination of the SOPs in effect at the time that Cox was shot. Obviously, matters would have been simplified if Dallas had merely identified the SOPs which were effective at the time of the drug raid, but the record before us does not indicate that Dallas did so.

As previously discussed, the evidence presented at the hearing on the first motion for sanctions demonstrated that Dallas had produced one version of a Tactical manual which was later repudiated in favor of a second version. At different times, Dallas had represented (in sworn testimony and statements) that both of these versions were effective at the time of the drug raid. No less than four versions were ultimately introduced into evidence at that first hearing, and it was shown that none of the manuals were dated in a manner that would allow independent determination of their effective dates. On January 4, 1988, Dallas produced another version of the Tactical Section manual. This version was now represented by Dallas (and sworn by Schifelbein) to be the manual that was in effect at the time of the Cox shooting. This manual was one of the manuals introduced by the Coxes at the first hearing.

The seventh motion for sanctions complained, among other things, of the above-described discovery problems. The motion alleged that Dallas's conduct was constructively fraudulent because agents and employees of Dallas either knew or should have known that previous sworn statements about requested and ordered documents were false. The motion noted a continuing pattern of incorrect production and non-production of court-ordered documents which were vital to the movants' case. The Coxes again alleged that these newest changes in the "rules of the game" would negate prior trial preparations and would necessitate additional consultations with experts and the redeposing of previously deposed witnesses. The motion asked the trial court to strike Dallas's pleadings. Dallas's response noted that it was a bureaucracy that managed millions of documents and that it had produced numerous documents containing between 7,000 and 10,000 pages. Dallas argued that its few failures were honest mistakes. It contended that the movants had exaggerated the need for redeposing witnesses and the corresponding expenses. Dallas maintained that, in view of the fact that it had been ordered to produce, under oath, the documents pertaining to policies by January 4, 1988, the movants should not have undertaken any additional consultations with experts until after the materials had been produced.

A hearing was held on the seventh and eighth motions for sanctions. No testimony was elicited at the hearing, but a number of pertinent documents were introduced into evidence. At the hearing on the seventh motion, the Coxes' counsel argued that some mistakes in discovery could possibly be justified, but the number of mistakes in this case, mistakes which prejudiced the Coxes and involved documents that were crucial to their lawsuit, indicated

bad faith and willful conduct on Dallas's part.

On January 19, 1988, the Coxes filed the eighth motion for sanctions. The motion complained of Dallas's belated production of documents concerning records management and disposition. As noted previously, the trial court had issued a detailed order on December 10, 1987. That order required Dallas to identify any written documents formerly possessed that had been destroyed, mutilated, altered, or lost regarding four specified matters, including Coleman's psychological records. The trial court ordered production of all written documents authorizing or directing the destruction, mutilation, alteration, or loss of those documents. The trial court also ordered the Chief of Police or an officer ranked captain or higher to clearly set forth in writing and under oath: (1) all documents which had been destroyed, mutilated, altered, or lost; (2) whether such destruction, mutilation, alteration, or loss was authorized and, if so, whether the authorization was written or oral; (3) the authorizing documents, if written; and (4) the identity of the authorizing person or persons and the date of the authorization, if the authorization was oral.

On January 18, 1988, Dallas supplemented its January 4 response to this order by producing a number of documents that set forth policies regarding the destruction and retention of records. The hearing on the second motion for sanctions (concerning Coleman's psychological records) had begun on January 5, 1988, and was concluded on January 13, 1988. As discussed previously, the Coxes had alleged, among other things, that Dallas had materially misstated the policy regarding destruction of the psychological records of police officers and that the records ultimately produced did not appear to be complete, genuine, and authentic. At the hearing on the second motion, a memorandum sworn to by Captain John Chappelle of the Dallas Police Department was introduced into evidence. In that memo, Chappelle stated that Coleman's psychological evaluation was discarded in accordance with a longstanding practice that was orally authorized. The

memo stated that the origin of the oral directive was unknown and that the Personnel Division did not have any written documents authorizing the destruction of records. Chappelle was also called as a witness at the hearing on the second motion. Edwin Spencer, Administrative Assistant to the First Assistant Chief of Police, and Dr. Somodevilla, the Dallas police psychologist, had also testified at the hearing about policies governing destruction and retention of records.

In the eighth motion for sanctions, the Coxes asserted that they were harmed by Dallas's belated production of the documents on records management. They contended that they were effectively deprived of the opportunity to examine witnesses at the recently concluded hearing about the newly furnished documents. The Coxes alleged that it was inconceivable that Dallas was unaware of the existence of the documents prior to or during the hearing. They maintained that the discovery and production of the documents after the hearing had concluded could not be merely another mistake. They asked the trial court to impose harsh sanctions, including, but not limited to, the striking of Dallas's pleadings. In its response, Dallas noted that some of the supplementing documents were found in the City Secretary's office, not at the police department. Dallas contended that its supplementation was an act of good faith and that its late response was an honest and understandable mistake. Dallas argued that the movants had not been harmed. At the hearing on the eighth motion for sanctions, the Coxes' counsel argued that it was unbelievable that the Dallas Police Department could be unaware of the existence of its own written policies regarding records retention and destruction.

The ninth motion for sanctions dealt with a number of alleged discovery problems. In their third request for production, the Coxes had asked for the report or findings of any expert or group of experts concerning the use of deadly force by the Dallas Police Department. The request stated that it included, but was not limited to, the

so-called Alpert report, which was the result of a study of the Dallas Police Department's deadly force policies. In response to this request, Dallas produced the Alpert report and some related documents. Dr. James Fyfe was a member of the group of experts that ultimately produced the Alpert report. The Coxes obtained from Dr. Fyfe documents that he had written and submitted to the Dallas Police Department in connection with the Alpert group's study. Those documents contained unfavorable and critical comments regarding various aspects of Dallas Police Department training, policies, and investigations with respect to the use of deadly force by Dallas police officers. The Fyfe documents were not produced by Dallas. The ninth motion asserted that the documents were clearly responsive to the third request for production and that the failure to produce the documents constituted an abuse of the discovery process. In response, Dallas contended that the documents were not within the scope of the requested discovery. Dallas maintained that a good faith search had not uncovered the documents.

The ninth motion also concerned production of documents and tangible things regarding the Dallas Police Department investigation of the Cox shooting. The Coxes alleged that investigative documents had been altered or were not authentic. They asserted that photographs taken at the scene of the shooting did not accurately depict the actual circumstances and the physical evidence as it existed following the shooting. The Coxes stated that various reports prepared by Dallas investigative officers contained material misstatements. They alleged a repetitive pattern of discovery abuse by Dallas. As to some of the allegations concerning reports, photographs, and physical evidence, Dallas did not specifically answer the allegations in its written response to the ninth motion for sanctions.[13] The Coxes sought various forms of relief, including the striking of Dallas's pleadings.

An extended hearing was held on the ninth motion. Most of the testimony related to the allegations regarding the production of documents, reports, and photographs concerning the Dallas Police Department's investigation of the shooting and collection of physical evidence. Investigator James R. Vineyard of the Dallas Police Department's Physical Evidence Section was one of the witnesses at the hearing. He was involved in the investigation of the circumstances of the Cox shooting. Vineyard testified that he photographed the machine gun that had been fired by Officer Coleman when Coleman shot Cox. The photograph showed the gun and the clip with twenty-six unexpended rounds, indicating that four rounds were missing from the thirty round capacity clip. Vineyard stated that the photograph showed the weapon as it was received following the shooting.

He identified two other photographs of a throw rug that was located in the condominium where the drug raid and the shooting took place. One photograph showed a shell casing situated on top of the throw rug. Vineyard stated that the photograph documented the position and condition of the shell casing at the time that he observed the scene. The second photograph showed the throw rug rolled back and a shell casing on the carpeted area underneath the throw rug. Vineyard testified that if it was assumed that the immediate area had not been disturbed, the position of the shell casing found under the rug was very strange and peculiar. He stated that two different shell casings were depicted by the two photographs. Vineyard expressed the opinion that the second casing was under the rug because of some disturbance.[14] He identified a third photograph depicting a third shell casing located underneath a chair. He stated that a total of four shell casings were found at the scene. He said that one of the shell casings was found on the shelf of an etagere close to a

---

13. It should be noted that some of the allegations themselves were not particularly specific.

14. Testimony showed, for example, that the paramedics who had treated Cox at the scene had worked in the area where the shell casings were found.

plant. Vineyard testified that he obviously had not photographed that shell casing, although he at one time thought he had. He also acknowledged that he had not photographed another shell casing that was found by Addison Police Captain Higgins. He said he did not photograph it because Higgins had moved it from its original location. When confronted with the suggestion that his testimony indicated that a total of five shell casings had been found, Vineyard then suggested that the photograph of the casing found under a chair depicted the casing found by Higgins. When asked if he had any basis for the suggestion that the casing found by Higgins was the same as the one photographed under a chair, Vineyard stated that he had no such basis.

Vineyard testified about a report he had prepared about the Cox shooting. He stated that his report was truthful and that all physical evidence collected at the scene was sent to the Southwest Institute of Forensic Sciences (SWIFS). He acknowledged that his report indicated that only four shell casings were found, and he testified that he submitted the four casings that he received to SWIFS.

Vineyard's report further stated that two projectiles were observed imbedded in the fireplace mantel. Later in the report, the two projectiles were more specifically described as a projectile and jacket found in the fireplace mantel.[15] Vineyard testified that he did not photograph the projectiles in their imbedded position in the mantel. He acknowledged that it would have been a much better investigative procedure to have photographed the projectiles in the mantel before they were removed.

Vineyard said that only one projectile and jacket combination was found at the scene and that it was found in the mantel. He stated that only one jacket was found, that being the one that was part of the projectile and jacket combination found imbedded in the mantel. He testified that a portion of a projectile was found underneath a table, but no jacket associated with that projectile was found.

The report produced by SWIFS based on the physical evidence submitted to SWIFS was introduced into evidence. In addition to four shell casings, the report showed two items identified as a missile [16] and jacket from the fireplace mantel. Another item was identified as a missile recovered from the jeans of the deceased. A missile removed from the body of the deceased was identified as another item. One last item was identified as being from an unknown source. It contained copper, iron, and manganese (whereas a bullet core or missile is made of lead), and it was not a fragment of a bullet jacket. When asked where the projectile found under the table was, Vineyard testified that it was the item identified by SWIFS as being something other than part of a bullet. The SWIFS report also referred to another item which was referred to as a missile whose characteristics were consistent with the characteristics of missiles fired from Officer Coleman's machine gun. It was also the same type of ammunition as the ammunition used in Coleman's gun on the night of the drug raid. This missile was found in the condominium by the occupant of the condominium and turned over to the Addison Police Department and then submitted to SWIFS.

Addison Police Captain Howard Higgins testified at the hearing. He said that he was a graduate of the FBI Academy, where he acquired training in what was referred to as the Forensic Section. He stated that when he arrived at the scene of the Cox shooting, he was not permitted to enter the condominium until after the officers from the Dallas Police Department Physical Evidence Section (PES) had finished their investigation. Higgins viewed

15. Testimony indicated that the term "projectile" refers to any part of the bullet that is fired from the barrel of the machine gun. A projectile can include the lead core of the bullet and the jacket of the bullet. Thus, the report's reference to a projectile and jacket refers to a core (or part thereof) and a jacket. A shell casing, on the other hand, is not fired from the barrel of the machine gun; it is ejected (to the right) from the gun.

16. "Missile" is another term used to refer to the lead core or part of the lead core of a bullet.

this as a reasonable restriction because of the desirability of avoiding disturbance of the scene.

Higgins stated that when he was allowed to enter the condominium, Vineyard informed him that the Dallas PES officers had found two shell casings. Higgins said that he began searching the area around where the casings would have been ejected. He found one on the shelf of an etagere near a potted plant. He testified that he did not pick up the casing because that would not, under any circumstances, be a proper investigative procedure. He said that the casing must be photographed first and then properly collected and preserved. He characterized this proper procedure as a very basic principle of police knowledge. Higgins advised one of the Dallas officers that he had found this casing. He testified that the Dallas PES officer, whom he could not identify, then picked up the shell casing. Higgins said that he then found a second casing lying on the floor behind the etagere. He also notified the Dallas officers of this find. He stated that a Dallas PES officer also picked up this casing without first photographing it or making any measurements.

Higgins testified that the Dallas officers left. He then continued to investigate the scene. When he examined the fireplace mantel, he observed what he thought were three bullet holes. He stated that one of the holes was a through-and-through type hole, meaning that one of the bullets had traveled all the way through the wood of the mantel. Higgins testified that the location of these bullet holes was not consistent with Officer Coleman's statements regarding the shooting. He said that there was no doubt that the condition of the mantel in the area of the holes was a material part of the physical evidence that could help to establish the trajectory of the fired bullets. He stated that there could be no dispute that the mantel's condition should have been documented and recorded. He said that he had examined the Dallas Police Department photographs of the scene, and there were no photographs of the part of the mantel where the bullet holes were located. Higgins examined the Dallas Police Department diagram of the scene and found no indication that the defects in the mantel were identified or measured.

Higgins said that there was a brass firewood holder which was located almost immediately underneath the holes in the mantel. Because he found no pieces of a bullet in the two holes that were not through-and-through holes, he looked in the firewood holder. He stated that he removed the firewood in order to complete his search and found the jacket of a bullet. He said that there could be no doubt that the item was the jacket of a bullet, and he found it unbelievable that the Dallas PES officers had not found it. The Dallas PES officers were then summoned back to the scene. Higgins testified that Investigator Dodge of the Dallas PES returned to the scene. Higgins discussed with Dodge the patterns he was seeing and pointed out the jacket in the firewood holder. He stated that he had not moved or touched the jacket. He said that when he pointed to the jacket, Dodge picked it up and put it in his (Dodge's) coat pocket. Higgins testified that the jacket should have been photographed and measured and properly collected and preserved.

Higgins noted that his examination showed no evidence that the bullet which had gone through the mantel had penetrated the plyboard behind the mantel. He stated that he and Dodge then examined the area behind the mantel, and they determined that the bullet must have gone into the dining room area. He said that Dodge then located a bullet underneath the dining room table. Higgins described the bullet as being in very good condition, the core with the jacket still attached, and still bearing wood marks and wood tracks in the grooves of the bullet. He testified that Dodge picked up the bullet and showed it to him. He said that the bullet was not photographed or measured or collected using appropriate techniques before Dodge disturbed it by picking it up. He stated that Dodge placed this bullet in the same coat pocket in which he had placed the jacket found in the firewood holder. Higgins said that this improper collection pro-

cedure concerned him because the bullet could be further scarred in the absence of proper preservation. He explained that he did not express his criticism to Dodge because Dodge did not work for him or his police department.

Higgins examined the SWIFS report on the items that were submitted by the Dallas Police Department. He had also examined the submitted items themselves. He testified that the jacket that he had found in the brass firewood holder under the mantel was not among the items submitted and described in the SWIFS report. He said that the bullet found under the dining room table also was not among the items submitted and described in the report. He stated that he had examined the item described in the report as an unknown metal fragment and that it was markedly different from the items found in the firewood holder and under the dining room table. He said that there was no way the unknown metal fragment, which was silver in color, could be confused with the other two items, which were not silver in color. He indicated that there was no resemblance between the items.

Higgins testified that the occupant of the condominium where Cox was shot had found a bullet in the couch across from the fireplace. He said that the Addison Police Department obtained that bullet and submitted it to SWIFS. Based on the SWIFS report regarding the characteristics of the bullet, Higgins expressed the opinion that the bullet had been fired from Officer Coleman's machine gun. He characterized his opinion as the only reasonable explanation in light of the type and weight of the bullet. Based on the items he found and the items submitted to SWIFS, Higgins testified that he counted at least five rounds, and possibly six, that were fired from Coleman's gun. He expressed the opinion that more than four shots were fired. Based on the physical evidence suggesting that five or more bullets were fired, Higgins stated that there was a probability that the photograph of Coleman's machine gun showing four expended rounds was a staged photograph.

Robert Adkins, a firearms examiner with SWIFS, testified at the hearing. He stated that the only firearms items received by SWIFS from the Dallas Police Department were four shell casings, the missile and jacket from the mantel, and the unknown metal fragment. He said that this evidence was ultimately returned to the submitting agency, the Dallas Police Department. He identified the missile and jacket said to be from the mantel, and he confirmed that they were submitted in a proper firearms container. Adkins examined the item described as an unknown metal fragment. He testified that it was clearly not a bullet or bullet fragment, and he indicated that that determination could be made by an experienced physical evidence investigator by merely looking at the item. He said that Captain Higgins of the Addison Police Department had expressed concern that some items had not been submitted to SWIFS. He stated that if a bullet jacket was found in the firewood holder and if a projectile with a jacket attached was found under the dining room table, they should have been submitted to SWIFS for evaluation. Adkins also testified about the bullet found in the couch and submitted by the Addison Police Department. He said it was the same type of bullet as the other submitted bullets, and it had the same rifling characteristics as the other submitted bullets.

Investigator Richard Dodge, of the Dallas Police Department Physical Evidence Section, testified at the hearing. He was one of the officers that collected evidence at the scene of the Cox shooting. He testified about the two Dallas Police Department photographs showing one shell casing on top of a throw rug and one shell casing under the throw rug. He said that neither of those photographs was staged or falsified, and he said that they depicted two different shell casings. He stated that the photograph of a shell casing under a chair depicted a third shell casing. Dodge testified that the casing underneath the chair was a casing that Captain Higgins of the Addison Police Department had brought to his (Dodge's) attention. He agreed that the casing found under the chair was not

underneath the etagere. He stated that the casing found by Higgins was not photographed because Higgins had picked it up from its original location. Dodge testified that he did not know where Higgins found the shell casing. As to this assertion, Dodge was impeached with his prior deposition testimony. In his deposition, Dodge had stated that Higgins handed him a shell casing which Higgins had found underneath the etagere. Dodge denied that this deposition testimony was inconsistent with his current testimony, but he acknowledged that underneath the chair was not the same as underneath the etagere.

Dodge stated that when physical evidence is found, its location should be documented and recorded. He agreed that it should be recorded on a diagram of the scene, and it should be photographed. When asked if the Dallas Police Department should have taken a photograph of the area of the mantel with the three bullet holes, Dodge said "yes."

At the hearing, an audio tape recording of an interview was played and transcribed by the court reporter. The persons being interviewed were Investigators Vineyard and Dodge and Sergeant Withers of the Dallas Police Department Physical Evidence Section. The lead interviewer was a Dallas County Assistant District Attorney.[17] In that interview, Dodge stated that one of the four shell casings found at the scene of the Cox shooting was found on the floor behind the etagere. He said another one was found on a shelf of the etagere. He acknowledged that no photograph was taken of the casing found on the shelf of the etagere. He said that the casing depicted in one of the photographs as being under a chair was the casing that was found behind the etagere. Dodge stated that the two photographs of shell casings on top of and underneath a throw rug depicted two other casings. At another point in the tape, when Dodge and the other officers are responding to questions about the shell casing found behind the etagere and the shell casing photographed

as being under a chair, the tape became inaudible for a period of time. When audibility resumed, the officers were being questioned about preservation of the shell casings.

Adkins, the SWIFS firearms examiner, was recalled and gave further testimony at the hearing. He said that the failure to measure and photograph shell casings and the failure to diagram and photograph the defects in the mantel were significant failures. He stated that those failures made a thorough and objective investigation of the Cox shooting extremely difficult. He testified that the manner of producing evidence in the Cox case was below standards.

On April 12, 1988, the trial court entered its order on the second through ninth motions for sanctions. The trial court found that those motions were meritorious and should be granted, and the court made these findings:

> [T]he court finds that the City of Dallas has repeatedly refused to comply with discovery requests of the Plaintiffs or the Intervenors, that the City of Dallas has destroyed, misplaced, or withheld relevant materials subject to the discovery requests of the Plaintiffs or the Intervenors and that the City of Dallas has produced evidence and documents of questionable character and authenticity in response to the discovery requests of the Plaintiffs and Intervenors. The court further finds that despite prior warnings from the court and the prior imposition of limited sanctions for such conduct, the City of Dallas has persisted in such conduct, undeterred by warnings, orders, or lesser sanctions from the court.

The trial court ordered that Dallas's pleadings "shall be and hereby are stricken without the right to further plead." The trial court further decreed that Dallas was liable to the plaintiffs and intervenors on all claims contained in their first amended

---

**17.** The tape recording was obtained from the Dallas County District Attorney's Office pursu- ant to a court order.

original petition. The court ordered a trial for determination of damages.

■ We have previously noted that if a trial court properly finds, or could properly have found, that a failure to comply with discovery requests or orders was willful, in bad faith, or due to some fault of the disobedient party, the sanction of striking a party's pleadings will generally be upheld. *See, e.g., Woodruff,* 721 S.W.2d at 868–69. In determining the propriety of sanctions, the trial court is entitled to consider the entire record of the case. *Woodruff,* 721 S.W.2d at 868; *see Downer,* 701 S.W.2d at 241. In a hearing on a motion for sanctions, the trial court is the judge of the credibility of the witnesses and the weight of their testimony, since he has the opportunity to observe the demeanor of the witnesses. He may believe all, part, or none of any witness's testimony. *See Tate v. Commodore County Mut. Ins. Co.,* 767 S.W.2d 219, 224 (Tex.App.—Dallas 1989, writ denied). Discovery sanctions imposed by a trial court will be set aside only if the court clearly abused its discretion. *Bodnow,* 721 S.W.2d at 840. The test for abuse of discretion is not whether the reviewing court thinks that the facts presented an appropriate case for the trial court's action. Rather, the question on appeal is whether the trial court acted without reference to any guiding rules and principles. *Downer,* 701 S.W.2d at 241–42.

■ We determine that the trial court did not abuse its discretion in striking Dallas's answer. The trial court's findings have evidentiary support, and those findings constitute determinations that Dallas's conduct with respect to discovery was either willful, in bad faith, or due to fault on Dallas's part. The trial court specifically found that Dallas had repeatedly refused to comply with discovery requests, had destroyed, misplaced, or withheld relevant requested materials, and had produced evidence and documents of questionable character and authenticity.

We note that the record shows a pattern of failure to produce materials that were crucial to the lawsuit's resolution. The Dallas Police Department had inordinate difficulty in identifying and producing documents that set forth the department's own policies. Dallas produced and then repudiated not one, but two, Tactical Section manuals that allegedly governed the conduct of the drug raid. Since the first two were eventually disowned, Dallas produced a third Tactical manual that was represented to be controlling. The Dallas Police Department had similar trouble with the SOP manuals. Initially, Dallas produced only the 1987 manual, but it was later repudiated in favor of a 1983 manual with various amending documents. The record indicates that the 1987 manual was not controlling at the time of the drug raid, and the record does not establish what part, if any, of the second produced manual was effective at the time of the Cox shooting. Dallas's initial production of documents concerning deadly force policies was also incomplete. The findings of any expert regarding the use of deadly force were requested, but Dallas did not furnish one expert's report that was critical of the Dallas Police Department.

With respect to Officer Coleman's psychological records,[18] there was evidence and testimony that supported the trial court's finding that Dallas had destroyed or withheld relevant materials. There was considerable expert testimony that psychological records that were not produced should have existed. There was testimony that provided a basis for determining that the records actually produced were of questionable authenticity. Although there was testimony explaining the absence of some of the requested records and the belated discovery of other records, the trial court, as the judge of the credibility and weight of the witnesses' testimony, could well have believed the testimony indicating that furnished records were not genuine and missing records were improperly destroyed or withheld. Even if the trial court was inclined to give Dallas the benefit of the doubt, the testimony of the custodian of

---

**18.** Those records were certainly relevant to the allegations concerning selection of officers; psychological support, testing, and training of officers; and investigation of shootings by officers.

the furnished records suggested that Dallas's efforts to locate the records were less than diligent.

There was evidence of a similar pattern of conduct regarding documents pertaining to policies governing records disposition. Dallas Police Department employees initially represented that Coleman's psychological records were destroyed in accordance with an oral policy directive. A written directive on records management indicated that such destruction violated Dallas's own policies. There was testimony suggesting that the written directive was not applicable, but the trial court could have found that testimony unpersuasive. Dallas eventually produced documents concerning records disposition that indicated that the written directive was indeed applicable. These documents were furnished a few days after the conclusion of a hearing in which a number of witnesses were questioned regarding records management policies. The documents were certainly relevant to issues dealt with at the hearing, and the belated production of the documents effectively foreclosed a full inquiry on those issues.

With respect to requested materials concerning the Dallas Police Department investigation of the Cox shooting, there was considerable evidence in support of the trial court's findings of destroyed or withheld materials and documents of questionable authenticity. There were major inconsistencies between different police officers' versions of events surrounding the investigation. Virtually all witnesses acknowledged that the Dallas Police Department investigation involved a number of suspect acts and omissions, but no one provided a satisfactory explanation for those questionable acts and omissions. The trial judge could well have believed that only a portion of the physical evidence recovered from the scene was disclosed to the Coxes. Likewise, the trial judge could have concluded that several missing photographs critical to the investigation had in fact been taken but were being suppressed and that at least one photograph, represented as showing only four expended rounds, had been fabricated by Dallas.

The evidence and testimony presented at the hearings on the motions for sanctions clearly show continuing failures on Dallas's part to comply with discovery requests and orders. The record provides evidentiary support for the trial court's findings that those failures resulted from more than mere mistakes and oversights. Most, if not all, of the identified failures involved materials that were relevant and probative with respect to material issues involved in the lawsuit. Under these circumstances, we cannot say that the trial court abused its discretion by striking Dallas's pleadings.

Dallas argues that some of the motions for sanctions should not have been granted. For example, the fifth motion complained of Dallas's alleged violation of the trial court's "gag order." Dallas maintains that this motion had nothing to do with discovery, and we are inclined to agree. The fourth motion complained of Dallas's failure to stipulate with respect to an issue that was arguably disputed. We previously postponed discussion of the third, fourth, fifth, and sixth motions for sanctions because no hearing was conducted on the third, fourth, and sixth motions and the fifth motion was not related to discovery problems. We determine that it is unnecessary to decide the propriety of the granting of those motions because the record contains ample justification for the granting of the remaining motions and the trial court's imposition of sanctions. The trial court did not act arbitrarily, capriciously, or unreasonably, nor did it act without reference to any guiding rules or principles. *See Downer*, 701 S.W.2d at 241–43. The sanction was authorized. *See* TEX.R.CIV.P. 215(2)(b)(5), 215(3). In our view, the penalty imposed furthered the legitimate purposes of discovery sanctions. *See Bodnow*, 721 S.W.2d at 840. We overrule Dallas's first point of error.

In its third point of error, Dallas maintains that the trial court abused its discretion in rendering a default judgment against Dallas on the issue of liability. Dallas contends that the Coxes' petition fails to state a cause of action and cannot support a default judgment. *See Stoner v.*

*Thompson,* 578 S.W.2d 679, 682–83 (Tex. 1979); *Allied Bank v. Pleasant Homes, Inc.,* 757 S.W.2d 460, 462 (Tex.App.—Dallas 1988), *writ denied per curiam,* 776 S.W.2d 153 (Tex.1989).

The Coxes alleged a cause of action under 42 U.S.C. § 1983. As previously noted, such a cause of action is stated when a plaintiff alleges that death was caused by the use of excessive force by police officers, thereby effecting an unreasonable seizure of a person under the Fourth Amendment. *See Graham v. Connor,* 109 S.Ct. at 1867, 1871; *Brower v. County of Inyo,* 109 S.Ct. at 1380, 1382; *Tennessee v. Garner,* 471 U.S. at 7, 105 S.Ct. at 1699. A city may be held liable under section 1983 when execution of its policies or customs inflicts injury amounting to a constitutional deprivation. *City of Canton v. Harris,* 109 S.Ct. at 1203; *Monell v. Department of Social Servs.,* 436 U.S. at 694, 98 S.Ct. at 2037–38. A city's failure to train its employees in a relevant respect reflecting a deliberate indifference to the rights of its inhabitants may properly be considered a custom or policy that is actionable under section 1983. *City of Canton,* 109 S.Ct. at 1205 & n. 10. A section 1983 plaintiff must state specific facts, not merely conclusory allegations. *Palmer v. City of San Antonio,* 810 F.2d 514, 516 (5th Cir.1987).

Dallas contends that the Coxes pleaded only general and conclusory allegations. This contention lacks merit. The petition which had been on file for four months when the trial court imposed the sanction contained four pages of detailed factual allegations. It alleged the factual circumstances of the shooting of Ron Cox. It alleged that Ron Cox's death was caused by the use of excessive force inflicted pursuant to the Dallas Police Department's policies or customs. The Coxes alleged that the execution of, and compliance with, Dallas Police Department policies, including training policies, caused Ron Cox's death, thereby depriving him of his constitutional right to be free from unreasonable seizure. They alleged that the policies were such that Dallas officials knew or should have known that Dallas police officers were likely to kill without proper justification and restraint. They alleged that Dallas armed its police officers with machine guns on fully automatic mode in reckless disregard of, or deliberate indifference to, the fact that use of such weapons would cause constitutional deprivations.

The petition also contained specific allegations about additional matters. The Coxes alleged that it was the Dallas Police Department's habit, practice, and custom to select improper officers for its Tactical Unit. They alleged that Officer Coleman's employment history indicated that he should not have been chosen as a tactical officer. The Coxes alleged that the Dallas Police Department had a habit, practice, and custom of inadequately training its tactical officers. They contended that Coleman had participated in a program which caused him to overreact. They alleged that he had not been retrained after he had shot a person under questionable circumstances. The Coxes alleged improper administration of policies, procedures, rules, and regulations governing tactical officers in high risk apprehensions and hazardous drug warrant operations. They contended that this improper administration included the failure to provide proper written procedures to govern such activities. The Coxes alleged that the Dallas Police Department had a habit, practice, and custom of providing inadequate psychological support, testing, and training for its officers. They alleged the destruction of, and failure to create and maintain, psychological records. The Coxes alleged that it was the habit, practice, and custom of the Dallas Police Department to inadequately investigate police shootings. They maintained that this practice involved improper reconstruction of events and the failure to recover crucial items of evidence. They alleged that review boards routinely upheld the validity of police shootings. They contended that Crimes Against Persons and Internal Affairs investigations, although nominally independent, were not truly independent. The Coxes alleged that the Dallas Police Department had a habit, practice, and custom of allowing unlawful and inadequate

execution of, and compliance with, existing rules, policies, and procedures. They alleged that no proper measures were taken to insure adequate and correct compliance with rules, policies, and procedures.

Dallas maintains that the Coxes alleged, at most, a cause of action based on negligence. Dallas relies on authorities that state that mere negligence does not give rise to a section 1983 cause of action. There are several problems with Dallas's argument. First, the petition clearly alleged recklessness and deliberate indifference on Dallas's part. Second, most of the cases cited by Dallas involved claims of constitutional deprivations under the due process clause of the Fourteenth Amendment. *See Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986); *Jacquez v. Procunier,* 801 F.2d 789, 792 (5th Cir.1986). The Coxes alleged an unconstitutional seizure of the person under the Fourth Amendment. Such claims are analyzed not in terms of whether the constitutional deprivation amounted to more than mere negligence but by inquiring whether the seizure was objectively reasonable. *See Graham v. Connor,* 109 S.Ct. at 1867, 1871-72; *Brower v. County of Inyo,* 109 S.Ct. at 1382-83. Third, the remaining case relied on by Dallas is inapplicable because it did not involve the issue of whether a section 1983 claim was stated; the case simply states that mere proof of a negligently executed seizure does not necessarily amount to proof of an unreasonable seizure. *See Young v. City of Killeen,* 775 F.2d 1349, 1353 (5th Cir.1985).

Dallas cites two cases for the proposition that the Coxes were required to allege a severe injury, a grossly disproportionate use of force under the circumstances, and malice on the part of the officer who effected the seizure. *See Raley v. Fraser,* 747 F.2d 287, 289 (5th Cir.1984); *Shillingford v. Holmes,* 634 F.2d 263, 265 (5th Cir. Unit B Jan. 1981). These cases are inapposite because they deal with the elements of a claim against the individual police officer as opposed to a claim against the municipality. In the case before us, the trial court rendered a default judgment only against Dallas, not against Officer Coleman. Moreover, the Fifth Circuit has abandoned the standards set forth in *Shillingford* and *Raley* because they were based upon substantive due process, whereas the United States Supreme Court has held that the Fourth Amendment's "objective reasonableness" standard governs claims that excessive force was used in a seizure of the person. *Brown v. Glossip,* 878 F.2d 871, 872-73 (5th Cir.1989); *see Graham v. Connor,* 109 S.Ct. at 1867, 1870-71. We hold that the Coxes did state a cause of action under section 1983.

■ Dallas also claims that the Coxes failed to state a cause of action under the Texas Tort Claims Act. Dallas relies on section 101.055(3) of the act, which states:

> This chapter does not apply to a claim arising:
>
> . . . .
>
> (3) from the failure to provide or the method of providing police or fire protection.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.055(3) (Vernon Supp.1990). However, several cases interpreting the virtually identical statutory predecessor indicate that the retention of governmental immunity contained in section 101.055(3) is not a blanket retention. Before it was codified in the Civil Practice and Remedies Code, the applicable statute provided:

> The provisions of this Act shall not apply to:
>
> . . . .
>
> (9) Any claim based on an injury or death . . . arising out of the failure to provide, or the method of providing, police or fire protection.

TEX.REV.CIV.STAT.ANN. art. 6252-19, § 14(9) (Vernon 1970) (repealed 1985). In analyzing this statutory language, the Texas Supreme Court held that it did not apply broadly to *any* act or omission that occurs while an officer is providing police protection to the public. Based on the definition of "method," the court reasoned that the method of providing police protection refers to the governmental decisions as to

how to provide police protection. The court held that the provision was designed to avoid judicial review of policy decisions made by a governmental entity charged with providing police protection. The court distinguished the formulation of policy from the implementation of policy and concluded that a governmental unit could therefore be liable for an officer's conduct in carrying out policy. *See State v. Terrell,* 588 S.W.2d 784, 787–88 (Tex.1979); *see also Forbus v. City of Denton,* 595 S.W.2d 621, 623 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.). Thus, the statute does not retain complete immunity for all acts that would come under the definition of police protection. *Norton v. Brazos County,* 640 S.W.2d 690, 692 (Tex.App.—Houston [14th Dist.] 1982, no writ).

We see no reason to interpret the codified language in section 101.055(3) differently from the substantively identical language in former article 6252–19. Because section 101.055(3) does not provide for absolute immunity for acts involving the provision of police protection, we are inclined to the view that the petition filed by the Coxes does not necessarily fail to state a claim under the Texas Tort Claims Act. In addition to complaints about policy formulation, the petition contains complaints about policy implementation.

■■■■ Governmental immunity is an affirmative defense that must be pleaded by the governmental entity in order to avoid liability. *Davis v. City of San Antonio,* 752 S.W.2d 518, 519 (Tex.1988); *see* TEX.R.CIV.P. 94. Since the Texas Tort Claims Act provides for only a limited waiver of governmental immunity, *State v. Terrell,* 588 S.W.2d at 785–86; *Westbrook v. City of Edna,* 552 S.W.2d 608, 611 (Tex. Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.), Dallas's reliance upon section 101.055(3), which restricts the legislative waiver of governmental immunity, constitutes an assertion of governmental immunity. When a defendant's answer has been

stricken as part of a discovery sanction, the result is the same as if the defendant has failed to answer. The allegations in the plaintiff's petition are admitted. *Fiduciary Mortgage Co. v. City Nat'l Bank,* 762 S.W.2d 196, 200 (Tex.App.—Dallas 1988, writ denied). In the absence of an answer, Dallas obviously has not effectively asserted the affirmative defense of governmental immunity, as required under *Davis.* To hold otherwise would be to thwart the purposes of sanctions and would effectively demean the sanction imposed. By purpose and definition, sanctions involve the imposition of adverse consequences. *See Bodnow,* 721 S.W.2d at 840; TEX.R.CIV.P. 215(2), (3), (4), (5). In this case, one of the adverse consequences suffered by Dallas is waiver of the defense of governmental immunity. We decline to hold that the Coxes did not state a cause of action under the Texas Tort Claims Act.

Because of our holdings about the pleading of a cause of action under section 1983 and the Texas Tort Claims Act, we need not determine whether the Coxes stated a cause of action under Texas common law.[19] We overrule Dallas's third point of error.

■■■■ In its fourth point of error, Dallas argues that the trial court abused its discretion in striking its answer as to intervenor R.D. Cox. Dallas maintains that R.D. Cox did not join in any of the discovery requests or motions for sanctions. Dallas notes that rule 215 provides that the *discovering* party may move for sanctions. TEX.R.CIV.P. 215(1)(b). However, we find nothing in the rule suggesting that the striking of a pleading is effective only as against a discovering party. One court has held that a party who did not request discovery is entitled to rely upon discovery materials that are provided in response to parties who did request discovery. *Carr v. Harris County,* 745 S.W.2d 531, 533 (Tex. App.—Houston [1st Dist.] 1988, no writ). The court noted that sanctions are imposed

---

**19.** However, we note that the reasoning in *Davis v. City of San Antonio* would be equally applicable to a case in which a governmental unit was defending a common law cause of action. *See Davis,* 752 S.W.2d at 519–20. Therefore, assuming that *Davis* was applicable to such a case, if a governmental entity failed to plead the affirmative defense of immunity, it could not avoid liability on that basis.

to punish as well as compensate and that they protect the court as well as the parties. The court approved the dismissal of a plaintiff's claim against all defendants even though only one defendant had sought the discovery which was not produced. *Id.* In our view, the *Carr* decision is in accordance with the proper purposes of discovery sanctions. Moreover, there is no need for all parties to submit identical requests for discovery if, by agreement or practice, the requesting party shares the produced materials with the other parties. In this regard, we note that R.D. Cox intervened as a plaintiff and was represented by the same counsel who represented the other Cox family members. No abuse of discretion has been shown. We follow *Carr* and overrule the fourth point of error.

 Dallas argues in its fifth point of error that the trial court abused its discretion in striking Dallas's answer to a newly amended petition. Dallas maintains that the Coxes waived their right to a default judgment on liability by realleging liability facts in their second amended petition filed after the trial court struck Dallas's earlier answer. After the filing of the second amended petition, Dallas filed a new answer in response to the petition. Dallas contends that it had the right to answer the new petition. We disagree.

First, we note that the second amended petition alleged no new facts concerning liability. The only new materials contained in the petition were specific and itemized allegations concerning damages. After the trial court struck Dallas's answer and rendered judgment on liability, the only issue remaining was the amount of damages to be awarded to the Coxes. By detailing alleged damages, the Coxes certainly did not waive their previously adjudicated right to a default judgment on liability. There was no intentional relinquishment of a known right or intentional conduct inconsistent with the claiming of that right. *See Sun Exploration and Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex.1987). Second, the trial court struck Dallas's answer "without the right to further plead." Dallas's additional pleadings were in violation

of the trial court's sanctions. A trial court clearly possesses the power to strike an answer, keep it stricken, and enter a default judgment. The trial court's exercise of that power in this case did not constitute an abuse of discretion. *See Woodruff,* 721 S.W.2d at 870–71. We overrule Dallas's fifth point of error.

In its sixth and seventh points of error, Dallas maintains that the trial court abused its discretion in overruling Dallas's motion for automatic sanctions and in granting a motion for continuance. On the day of the trial on damages, Dallas filed a motion for automatic sanctions and for a directed verdict. Dallas alleged that the Coxes had failed to supplement responses to interrogatories inquiring about the factual bases for allegations concerning damages. Since Dallas contended that the Coxes could not present evidence of damages because of the automatic sanction under rule 215(5), Dallas also moved for a directed verdict that the Coxes take nothing. *See* Tex.R. Civ.P. 215(5).

Rule 215(5) provides that a party who fails to supplement a discovery response shall not be entitled to present evidence which the party had a duty to provide in a supplemental response unless the trial court finds that good cause exists for admission of the evidence. Tex.R.Civ.P. 215(5). At the proceedings on Dallas's motion, counsel for the Coxes represented that the factual bases for the alleged damages had in fact been provided to Dallas, although not in the form of supplemental responses to Dallas's interrogatories. Counsel stated that the information had been provided in depositions and in written documents and records, including medical bills and records, funeral bills, tax returns, cards, letters, videotapes, photograph albums, photographs, a complete workers' compensation file, wage and benefit information, Internal Revenue Service information and forms, and a Special Damage Brochure that had been provided to Dallas. In an order dated August 12, 1988, the trial court granted permission to the Coxes to withdraw their announcement of ready, and the trial was continued and reset for a later date. The court found that the Coxes

had provided full and complete disclosure of the information sought by interrogatories but had not formally designated their responses as supplementation. The trial court found good cause for allowing further supplementation in written and verified form. By an order dated September 20, 1988, the trial court denied Dallas's motion for automatic sanctions and directed verdict.

 Because the trial was continued and reset, and because the Coxes formally and timely supplemented their interrogatory responses, rule 215(5) was thereby rendered inapplicable. In any event, the trial court's finding that good cause existed for allowing further supplementation was not unwarranted. The automatic exclusion of evidence under rule 215(5) is subject to a good cause exception, and a finding on good cause is within the trial court's discretion. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). On the other hand, the good cause exception should not provide a means for evading the duty to engage in full discovery. *Clark v. Trailways, Inc.*, 774 S.W.2d 644, 646 (Tex. 1989), *cert. denied,* — U.S. —, 110 S.Ct. 1122, 107 L.Ed.2d 1028 (1990). In view of the trial court's finding that the requested information had in fact been provided, albeit not in proper form, we cannot say that the trial court abused its discretion. The record supports the court's implied determination that there was no evasion of the duty to furnish full discovery. For these same reasons, the trial court did not abuse its discretion in granting a continuance. *See State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex.1988) (granting or denial of continuance within trial court's discretion and will not be reversed in absence of clear abuse of discretion). We overrule the sixth and seventh points of error.

 In its eight and ninth points of error, Dallas contends that the trial court abused its discretion in disallowing discovery and testimony regarding Ron Cox's conduct on the night he was shot. After the trial court struck Dallas's pleadings and rendered judgment against Dallas on liability, Dallas began depositions on damages. At one of those depositions, counsel for Addison instructed the Addison Chief of Police not to answer questions concerning the propriety of Ron Cox's conduct on the night of the drug raid. Dallas filed a motion to compel testimony, arguing that the discovery sought was relevant to the issue of loss of future earnings. The trial court denied the motion. In its order denying the motion to compel, the trial court found that the Coxes had agreed to waive any claims for loss of future earnings by Ron Cox based on any actual or potential promotion within the Addison Police Department. The court further found that the discovery sought by Dallas would have the effect of avoiding and frustrating the previous order imposing the sanction of striking Dallas's answer and rendering judgment on liability. In clarification of its previous order imposing sanctions, the trial court ordered that no evidence of any kind relating to liability issues was to be sought, including any evidence that Ron Cox's conduct was inappropriate or causally related to his death. At the trial on damages, evidence of Ron Cox's conduct was excluded.

The Coxes argue that Dallas was attempting to reopen the issue of liability and put evidence on that issue before the jury. We determine that the trial court's order denying the motion to compel and clarifying its previous sanctions order was justified. The trial court had authority to enforce and clarify its previous order. *See* Tex.R.Civ.P. 215(2)(b)(1), (3), (4), (5). In our view, the trial court's rulings in this regard did not constitute an abuse of discretion. The trial court was enforcing its sanctions.

 After rendition of a default judgment as a sanction, the right to cross-examine witnesses regarding damages does not extend to an inquiry into the basis of a default judgment. The sanctioned defendant may properly be prohibited from presenting any grounds of defense to the plaintiff's cause of action. *Brantley v. Etter*, 662 S.W.2d 752, 759–60 (Tex.App.—San Antonio 1983), *writ ref'd n.r.e. per curiam*, 677 S.W.2d 503 (Tex.1984). Moreover, even if evidence is relevant and there-

fore generally admissible, the trial court, exercising its discretion, may exclude the evidence if its probative value is substantially outweighed by certain specified countervailing factors, such as unfair prejudice, confusion of the issues, or the possibility of misleading the jury. *See* TEX.R.CIV.EVID. 402, 403; 33 S. GOODE, O. WELLBORN, & M. SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 403.1, at 88–89 (Texas Practice 1988); *see also Luvual v. Henke & Pillot*, 366 S.W.2d 831, 838 (Tex.Civ.App.—Houston [1st Dist.] 1963, writ ref'd n.r.e.) (trial judge has considerable discretion in determining admissibility of evidence). We conclude that the trial court could have properly determined that evidence of the impropriety of Ron Cox's conduct, because it was relevant to the issue of liability, would have been unfairly prejudicial to the Coxes on the issue of damages. The trial court would also have been warranted in finding that any probative value of the evidence was substantially outweighed by the dangers of confusing the issues or misleading the jury. If Ron Cox's conduct was relevant to the issue of damages, it was also relevant to the issue of liability, an issue that was not before the jury. There was some danger that the jury would be improperly influenced by evidence on liability in resolving the separate issue of damages. Thus, there was no abuse of discretion. We overrule the eighth and ninth points of error.

■ Dallas argues in its tenth point of error that the trial court abused its discretion in severing the claim for attorney fees from the damages claim. Dallas's reliance on a United States Supreme Court case is misplaced. *See North Carolina Dep't of Transp. v. Crest St. Community Council, Inc.*, 479 U.S. 6, 107 S.Ct. 336, 93 L.Ed.2d 188 (1986). This case does not stand for the proposition asserted by Dallas. The case involved a suit for attorney fees under 42 U.S.C. § 1988. *See* 42 U.S.C.A. § 1988 (West 1981). The plaintiffs who were seeking attorney fees had obtained enforcement of federal civil rights laws by administrative procedures and by settlement, not by litigation. *North Carolina Dep't of Transp.*, 107 S.Ct. at 338–39. In that con-

text, the United States Supreme Court held that attorney fees under section 1988 can be awarded for proceedings only when those proceedings are part of, or followed by, a lawsuit. The Court stated that it is entirely reasonable to limit awards of attorney fees under section 1988 to situations in which the party seeking relief found it necessary to file a complaint in court. *Id.* at 341. The Court did not rule that a claim for attorney fees under section 1988 cannot be severed from the lawsuit involving the merits of the civil rights claim. The case before us is clearly distinguishable from the *Crest Street Community Council* case. The Coxes did find it necessary to file a lawsuit under section 1983 in order to obtain relief.

A request for attorney fees under section 1988 raises legal issues that are collateral to the main cause of action and that require an inquiry separate from the decision on the merits. In fact, since only a prevailing party is entitled to attorney fees, the inquiry cannot even begin until a party has prevailed. The award of attorney fees under section 1988 is not compensation for the injury giving rise to the main cause of action; an award of attorney fees "is uniquely separable from the cause of action to be proved at trial." *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 451–52, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982). Thus, it is not at all unusual for the issue of attorney fees to be severed from the principal cause of action. *See, e.g., Nash v. Chandler*, 848 F.2d 567, 572 n. 8 (5th Cir.1988). The applicable Texas rule states that "[a]ny claim against a party may be severed and proceeded with separately." TEX.R.CIV.P. 41; *see Kansas Univ. Endowment Ass'n v. King*, 162 Tex. 599, 611, 350 S.W.2d 11, 19 (1961). The trial court did not abuse its discretion in severing the claim for attorney fees. We overrule the tenth point of error.

■ In the eleventh point of error, Dallas contends that the trial court erred in overruling its motion for new trial or remittitur because the jury's award of damages for Ron Cox's pain and suffering was against the great weight and preponder-

ance of the evidence. In reviewing this factual insufficiency point, we must consider and weigh all of the evidence, and we cannot set aside a jury finding unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). In determining if damages are excessive, we employ the same test as for any factual insufficiency question. *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986). In doing so, we cannot pass on the credibility of witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached based on the evidence. *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App. —Dallas 1986, writ ref'd n.r.e.).

▮ The record shows that Ron Cox was shot at about 11:45 p.m. on Friday, December 12, 1986. He was given a shot of morphine at approximately 12:20 a.m. Saturday. Cox was transferred from Presbyterian Hospital at about 12:37 a.m., arriving at Parkland Hospital at about 12:45 a.m. Michele Gann, the assistant head nurse at Parkland who was involved in treating Cox, stated that he was groaning and expressing a lot of pain. Captain Higgins, Cox's commanding officer, said that Cox was moaning and groaning and appeared to be in a lot of pain. Dr. William Thompson, a surgeon who treated Cox, testified that Cox was in a great deal of pain and asked for something to relieve the pain. He said that no pain medication could be administered because it can have an adverse effect on blood pressure. Anesthesia was started at 1:00 a.m., using a general anesthetic. At 9:00 a.m., Cox was still unconscious because of the anesthesia. By 11:30 a.m. Saturday, he was awake. Cox was unable to speak because an endotracheal tube was inserted into his throat to aid his breathing.[20] Dr. Thompson testified that Cox would have been experiencing a good deal of pain at this time. He said that the injuries to the bowel were the most severe he had ever seen. He stated that because pain medication can cause a

drop in blood pressure, they were unable to administer pain medicine after an initial dose.

At 1:30 p.m. on Saturday, a Swan Ganz catheter was inserted into Cox's subclavian area underneath the collarbone and then threaded through his heart and into the pulmonary artery in his lung. Gann testified that this is a painful procedure. At 3:14 p.m., Cox was given morphine for his pain, but a reversal agent to counteract the morphine was administered at 3:37 p.m. because Cox's blood pressure dropped. Cox received no more pain medication from that point until he died at about 6:54 a.m. on Monday, December 15. Dr. Thompson said that Cox began deteriorating between 4:00 and 6:00 p.m. on Saturday and continued to deteriorate until he died. He said he could not know whether Cox felt pain during that period. Gann testified that Cox was conscious at least part of the time. She noted that 2:45 a.m. Sunday was the last time that Cox moved his extremities in response to a command. She stated that Cox was trying to thrash around, but was restrained. At 8:30 p.m. on Saturday, he was trying to bite the endotracheal tube which was in his mouth and throat. A bite block to prevent this was put in place. Dr. Charles Petty, the Chief Medical Examiner for Dallas County, stated his opinion that Cox had conscious pain until he lost consciousness and became quite changed on Sunday morning.

From 11:00 p.m. Saturday to 6:00 a.m. Sunday, Cox's blood pressure fell, and his blood oxygen level decreased. Around 11:50 p.m. Saturday, an interaortic balloon pump was placed in a blood vessel in Cox's groin and passed up into a major artery of the heart's aorta. The balloon was to be regularly inflated and deflated in an attempt to help Cox's heart, which was failing. This was a fairly experimental procedure which would not normally be used in trauma cases. Because Cox was moving all of his extremities, Pavulon, a paralyzing agent, was administered. Normally, a sed-

---

**20.** Insertion of the tube is a painful procedure, and the throat may be anesthetized because of the pain.

ative would also be given in order to control the patient's fear and decrease his awareness of being paralyzed. Since Cox's blood pressure was very low, no sedative was administered. Gann testified that the paralysis is an extremely frightening situation for a patient without sedation. Dr. Petty stated that Cox would have been terrified until the Pavulon wore off. Sometime prior to but around 3:45 a.m. on Sunday, the balloon pump was removed because it was not working properly. A second balloon pump was inserted, meaning that Cox had to go through the same procedure a second time.

At 5:45 a.m. on Sunday, Cox was moving his head and his upper extremities. At 7:00 a.m., he was moving his head from side to side. Gann stated that this indicated that Cox was aware and probably suffering pain, but he was not alert enough to respond to commands. At 6:54 a.m. on Monday, December 15, Cox was pronounced dead.

Dr. Petty conducted the autopsy of Cox's body. He stated that the body was grossly edematous, meaning that there was excess fluid in the tissues causing an enormous amount of swelling and disfigurement. Dr. Petty stated that he had never seen more fluid accumulation than he saw in Cox's body. He said that Cox had suffered a massive injury and obviously suffered a great deal of pain, as well as apprehension, fear, and terror. He stated his opinion that Cox suffered until sometime after 7:00 a.m. on Sunday, December 14.

The jury awarded $1,000,000 for Cox's pain and suffering. Dallas argues that the jury could have found that Cox was fully conscious for only about ten hours. However, this interpretation of the evidence is based only on the evidence that arguably does not support the jury's award of damages. That is not the correct standard for our review of the evidence. When all of the evidence is properly considered, we determine that it provides ample support for the jury's award. There was considerable evidence of extreme pain and suffering (including fright or terror), and there was evidence indicating that Cox suffered for

considerably longer than the ten hours suggested by Dallas. We cannot say that the jury's finding was so against the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule the eleventh point of error.

Dallas argues in its twelfth point of error that the trial court erred in overruling Dallas's motion for judgment notwithstanding the verdict with respect to the jury's finding of psychological expenses. The jury awarded damages of $68,053 for reasonable and necessary past and future psychological expenses of Suzanne Cox and her daughters. Dallas relies on *Moore v. Lillebo*, 722 S.W.2d 683 (Tex.1986), for the proposition that such expenses are not recoverable in a wrongful death action. However, we find no indication in that case that the list of elements of recoverable damages was meant to be a comprehensive and exclusive list governing all wrongful death cases. The court merely listed the elements of damages that were relevant to the case before it. *See id.* at 687–88.

An award of damages is defined as the sum of money the law awards as pecuniary compensation, recompense, or satisfaction for an injury done or a wrong sustained as a consequence of a breach of a contractual obligation or a tortious act. *McRae v. Lindale Indep. School Dist.*, 450 S.W.2d 118, 124 (Tex.Civ.App.—Tyler 1970, writ ref'd n.r.e.). Pecuniary compensation may be had for an injury done or a wrong sustained as a consequence of a tortious act. *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 683 (Tex.App.—El Paso 1984, writ dism'd by agr.). In awarding compensatory damages, it is the purpose of the law to repair the wrong that has been done. *King v. Acker*, 725 S.W.2d 750, 756 (Tex.App.—Houston [1st Dist.] 1987, no writ). A fundamental purpose of all rules of damages, except punitive damages, is to indemnify an injured party for pecuniary loss suffered, placing the injured party as nearly as possible in the position he would have occupied but for the injury. *Waldon v. Williams*, 760 S.W.2d 833, 834 (Tex.App.—Austin 1988, no writ). A plaintiff has the right to have the future consequences

of an injury placed in evidence before the jury if the evidence shows a reasonable probability of the occurrence of future ill effects of the injury. *J. Weingarten, Inc. v. Gauthier,* 305 S.W.2d 181, 197 (Tex.Civ. App.—Beaumont 1957, no writ).

■ Dallas does not contest the sufficiency of the evidence supporting the jury's award for psychological expenses, nor does Dallas contend that the past and future expenses were not reasonable and necessary. In our view, the psychological expenses found by the jury were an appropriate element of damages. They represented pecuniary compensation for injury suffered as a consequence of the wrongful act. The award was part of an attempt to repair the wrong done to the extent possible, although some of the harm suffered obviously cannot be undone. In accordance with basic principles of the common law of torts, compensatory damages awarded for a section 1983 violation can include out-of-pocket losses and other monetary harms. *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 306–07, 106 S.Ct. 2537, 2542–43, 91 L.Ed.2d 249 (1986). We overrule Dallas's twelfth point of error.

In its final point of error, Dallas maintains that the trial court erred in admitting a ballistic test report. The report showed the results of a test designed to demonstrate the effects that the bullets had on Ron Cox's body. Dallas argues that the Coxes sought to introduce the report as within the business records exception to the hearsay rule. *See* Tex.R.Civ.Evid. 803(6). The Coxes contend that the report was admissible as demonstrative evidence of an out-of-court experiment involving conditions similar to the occurrence in issue.

■ Out-of-court experiments conducted in the absence of the opposing party are admissible if there is a substantial similarity between the conditions existing at the time of the event at issue and the conditions existing at the time of the experiment. The conditions do not have to be identical. *Fort Worth & Denver Ry. v.*

*Williams,* 375 S.W.2d 279, 281–82 (Tex. 1964); *Garza v. Cole,* 753 S.W.2d 245, 247 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). When there is dissimilarity in the conditions, admission of the experiment is within the trial court's discretion if the differences are minor or subject to explanation. *Williams,* 375 S.W.2d at 282; *see Garza,* 753 S.W.2d at 247 (generally, trial court has broad discretion regarding admissibility of evidence of experiments).

■ Dr. Petty testified that the ballistic test was a standard and scientifically acceptable test which was accurate and reliable. He stated that the test results would fairly, accurately, and objectively portray to the jury the effects on the human body of the ammunition used. Dr. Petty said that he set the parameters of the test in order to duplicate conditions of the Cox shooting. He explained that gelatin blocks were used as targets because of their similarity to human tissue. David McLeod, the project engineer who supervised the conduct of the test, testified that the report fairly and accurately explained the test and the results.

We determine that the trial court did not abuse its discretion in admitting the test report. The requisites for admissibility were met. The test involved conditions substantially similar to the occurrence at issue, and necessary dissimilarities were explained.[21] We overrule the thirteenth point of error.

We affirm the trial court's judgment.

---

**21.** There would be obvious problems with attempting to duplicate exactly the Cox shooting.